| | |
|---|---|
| THOMAS JOHN MCKANE,<br>    Plaintiff,<br><br>v.<br><br>NANCY E. BERRYHILL,[1] ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY, U.S.A.,<br>    Defendant. | CIVIL ACTION NO.<br>3:16-CV-1707 (JCH)<br><br><br><br><br>MARCH 7, 2018 |

**RULING RE: CROSS MOTIONS TO REVERSE AND AFFIRM DECISION OF THE COMMISSIONER (DOC. NOS. 25 & 31)**

Plaintiff Thomas McKane ("McKane") brings this action under title 42, section 405(g) of the United States Code, appealing from the final determination of the Commissioner of Social Security ("the Commissioner"), which denied his application for Title II disability insurance benefits and Title XVI supplemental security income. Motion to Reverse the Decision of the Commissioner ("Pl.'s Mot.") (Doc. No. 25). The Commissioner cross-moves for an order affirming that Decision. Defendant's Motion for Judgment on the Pleadings ("Def.'s Mot.") (Doc. No. 31).

For the reasons set forth below, the Motion to Reverse the Decision of the Commissioner is **GRANTED**, and the Motion for Judgment on the Pleadings is **DENIED**. The case is remanded to the ALJ for proceedings consistent with this Ruling.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is hereby substituted as the defendant in this case, in place of the former Acting Commissioner of the Social Security Administration, Carolyn W. Colvin. See Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . resigns[ ] or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

The Clerk of Court is directed to correct the docket to reflect this substituted party.

## I. RELEVANT FACTS

The court adopts the facts to which the parties stipulated, see Def.'s Mot. at 3, and it will therefore only briefly describe the facts relevant to this opinion.

Thomas McKane was born in October 1961, making him 50 years old on his alleged disability onset date of January 1, 2012. In 2003, while working as an emergency room technician, McKane suffered one or more injuries to his lower back. Certified Transcript of Record ("R.") (Doc. No. 19) at 375–76, 397. An MRI conducted in January 2003, reflected disc degeneration and mild disc bulging. Id. at 375–76. The Record reflects that McKane has treated regularly with Dr. Frank Mongillo for back pain, for which Dr. Mongillo has consistently prescribed Percocet. See, e.g., id. at 386–413, 472–76, 620–46, 652–63.

In June 2003, McKane received lumbar facet joint injections to treat lower back pain. Id. at 397–99, 467. On July 18, 2003, Neurologist James McVeety noted that, since receiving the facet joint injections, McKane "has had the persistent symptoms of fatigue, lethargy, confusion, forgetfulness, right upper extremity tremor, stabbing head pain, word finding difficulty, dyslexia and weight loss." Id. at 467. Dr. McVeety noted that CT scans of McKane's head and abdomen conducted on July 6, 2003, were "essentially normal." Id. Dr. McVeety ordered an MRI scan of McKane's brain, which was "[u]nremarkable." Id. at 372.

The Record reflects that, by 2009, McKane had been diagnosed with "Major depressive disorder, recurrent, mild," "generalized anxiety disorder," "Cannabis abuse," and "Dependent personality disorder." Id. at 422. He has also been diagnosed with bipolar disorder. Id. at 672.

In July 2009, McKane treated at New Haven Hospital, reporting chest pain. Id. at 456–64. An echocardiogram did not reflect abnormalities. Id. On June 14, 2013, McKane saw Dr. Arumbakam Purushotham of the Connecticut Heart Group for "sharp chest pain that lasts for days and weeks," "palpitations and occasionally feels dizzy and lightheaded." Id. at 444. Dr. Purushotham concluded that "most of [McKane's] symptoms are related to his lifestyle and stress. He was strongly advised to stop smoking." Id. A chest x-ray and echocardiogram ordered by Dr. Purushotham were normal except for "mild aortic root dilation." Id. at 534–36.

## II.   PROCEDURAL HISTORY

On March 19, 2013, McKane filed applications for disability insurance and supplemental security income. See R. at 259–62, 263–70. In both applications, McKane alleged disability beginning on January 1, 2012. These claims were initially denied on July 15, 2013, and denied again upon reconsideration on March 4, 2014. See id. at 121–36 (disability determination explanation of July 15, 2013); id. at 155–70 (disability determination explanation of March 4, 2014). McKane then requested a hearing, which was held before Administrative Law Judge ("ALJ") Deirdre Horton on April 20, 2015. At the hearing, McKane testified, as did vocational expert Richard B. Hall ("Hall"). See id. at 93–120 (transcript of hearing). McKane was represented at the hearing by Attorney Ann Farrell.

On November 18, 2015, ALJ Horton issued an unfavorable Decision, denying McKane's applications. In her Decision, ALJ Horton concluded that McKane suffered from the following severe impairments: (1) degenerative disc disease; (2) anxiety disorder; and (3) personality disorder. Id. at 34. She noted that McKane had alleged an impairment related to a heart condition, but found that the Record did not reflect that a

3

heart condition "causes more than slight functional limitations." Id. She found that McKane's impairments did not meet or medically equal the listings for a disability. Id. at 34–36. She concluded that McKane has the residual functional capacity ("RFC") to "perform light work . . . involving occasional bending, squatting, crawling, and climbing; involving simple, routine tasks; and he works best on tasks alone, but can relate appropriately to others." Id. at 36. She noted that McKane had previously worked as a medical technologist, as a waiter, and as a retail clerk, but found that McKane could no longer perform any of these positions. Id. at 39. Finally, she concluded that work existed in significant numbers in the national economy that could be performed by McKane, and therefore found that McKane was not disabled as defined by the Social Security Act. Id. at 41.

## III.     STANDARD OF REVIEW

Under title 42, section 405(g) of the United States Code, it is not the district court's function to determine de novo whether the claimant was disabled. See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). Instead, the court is limited to two lines of inquiry: whether the ALJ applied the correct legal standard, and whether the record contains "substantial evidence" to support her decision. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an

analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

## IV. ANALYSIS

In his Motion to Reverse the Commissioner, McKane makes four arguments: (1) that ALJ Horton failed to following the treating physician rule, Pl.'s Mem. at 19–26; (2) ALJ Horton failed to adequately develop the medical record, specifically by failing to request treatment records from Dr. Cartwright, id. at 26–28; (3) ALJ Horton erred in her evaluation of McKane's testimony regarding pain, id. at 28–30; and (4) ALJ Horton's findings with respect to the number of jobs available in the economy that McKane can perform were not supported by substantial evidence, id. at 30–36. The court addresses the first two arguments together, as they are intertwined, and then addresses the remaining arguments.

### A. Treating Physician Opinion Evidence

The Record contains treating source opinions from two physicians: Dr. Maxine Cartwright, R. at 649–51, and Dr. Frank Mongillo, id. at 640–46 (opinion of 2013), id. at 678–80 (opinion of 2015). In her Decision, ALJ Horton discussed Dr. Cartwright's and Dr. Mongillo's opinions, but gave them "little evidentiary weight." Id. at 38–39. McKane argues that ALJ Horton erred in her evaluation of both treating sources. Pl.'s Mem. at 19–26. With respect to Dr. Cartwright in particular, McKane argues that ALJ Horton failed to develop the record adequately, which in turn prevented her from properly applying the treating physician rule to Dr. Cartwright's medical source statement. Id. at 26–30.

The treating source rule requires that a treating source's medical opinion be given controlling weight if it "is well-supported by medically acceptable clinical and

5

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). Even if controlling weight is not given, "some weight may still be attached to that opinion, and the ALJ must still designate and explain the weight that is actually given to the opinion." Schupp v. Barnhart, No. 3:02-CV-103 (WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12, 2004); see also 20 C.F.R. § 416.927(c)(2) ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence . . . .").

When a medical opinion is not given controlling weight, title 20, section 416.927 of the Code of Federal Regulations ("section 416.927") mandates that ALJs consider the following factors in assigning weight to the medical opinion: (1) whether the provider has actually examined the claimant; (2) the treatment relationship, including the length, frequency of examination, and nature and extent of the relationship; (3) whether the provider presents relevant evidence to support his or her conclusions, particularly objective evidence; (4) the degree to which the provider's opinion is consistent with the medical record as a whole; (5) whether the provider is a specialist giving an opinion within his or her specialty; and (6) any other factors which support or contradict the provider's opinion. 20 C.F.R. § 416.927. Section 416.927 further provides, "We will always give good reasons in our notice of determination or decision for the weight we give [the] treating source's medical opinion." Id.

1. Opinion of Dr. Cartwright

The Record contains a medical source statement completed by Maxine Cartwright, MD, under date of November 6, 2014. R. at 649–51. Dr. Cartwright's medical source statement reflects that McKane has marked or extreme limitations in nearly all work-related mental activities.[2] Id. at 649–50. Dr. Cartwright stated in her medical source statement that McKane "[i]s unable to open mail most days—he is unable to follow through with [Activities of Daily Living]: Because of his severe medical condition he was placed on steroids which precipitated his underlying psychiatric condition." Id. at 649. She described his symptoms as "overwhelming anxiety, debilitating depression, chronic & severe pain, [and] inability to sleep because of the pain." Id. at 650. She also described McKane as "physically disabled," noting that he "[h]as difficulty standing and walking" and "is unable to sit for any length of time." Id. Finally, Dr. Cartwright stated that McKane "is having difficulty managing his life because of his depression & anxiety" and opined that he would need help managing his benefits. Id.

ALJ Horton acknowledged Dr. Cartwright's opinions in her Decision, but elected to give them "little evidentiary weight" on the ground that her medical source statement was "conclusory and against the weight of the record as a whole." Id. at 39. She further noted that "[a] review of the exhibit file fails to identify any subjective or objective

---

[2] Out of ten functional areas, Dr. Cartwright opined that McKane had "moderate" limitations in two areas: (1) understanding and remembering simple instructions, and (2) making judgments on simple work-related decisions. R. at 649. She did not categorize any of McKane's mental functional areas as having no limitations or mild limitations. Id. at 649–50.

7

medical findings supporting a conclusion that limits the claimant as stated" by Dr. Cartwright.  Id.

In his Memorandum, McKane asserts that "the real issue" is that the Record is devoid of contemporaneous treatment records from Dr. Cartwright, and that ALJ Horton had an obligation to seek Dr. Cartwright's treatment records before rejecting her opinion.  Pl.'s Mem. at 25–26.  The Commissioner argues that McKane, not ALJ Horton, had the responsibility of "gathering and presenting evidence to support his claim" and that McKane "provides no evidence that any such records even exist," and takes issue with McKane's argument that reference to "mental health people" McKane was treating with should have alerted ALJ Horton to the absence of records.  Def.'s Mot. at 15–16.

Contrary to the Commissioner's assertions, an ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately.  See Rosa, 168 F.3d at 79.  Although this obligation is heightened where the plaintiff is pro se, see Echevarria v. Secretary of HHS, 685 F.2d 751, 755 (2d Cir. 1982), the "non-adversarial nature" of social security benefits proceedings dictates that the obligation exists "even when . . . the claimant is represented by counsel."  Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must himself affirmatively develop the record' . . . .") (quoting Echevarria, 685 F.2d at 755).

In Rosa, the Second Circuit was confronted with a case in which the ALJ had rejected the opinion of a treating physician because the treating physician's contemporaneous treatment records did not reflect certain findings.  168 F.3d at 79.  The Second Circuit held that "an ALJ cannot reject a treating physician's diagnosis

8

without first attempting to fill any clear gaps in the administrative record." Id. The Second Circuit found that the record before the ALJ in Rosa contained "clear gaps":

> The ALJ had before her only Dr. Ergas's sparse notes which reflected nine visits between himself and Rosa, considerably fewer visits than the two likely had based upon Rosa's testimony suggesting monthly treatment over a period of years. Moreover, Dr. Ergas's assessment was only one page in length and, as the ALJ recognized, wholly conclusory. Having nevertheless failed to request any additional records or support from Dr. Ergas, the ALJ was left to base her conclusions on incomplete information that was necessarily 'conclusive of very little.' Confronted with this situation, the ALJ should have taken steps directing Rosa to ask Dr. Ergas to supplement his findings with additional information.

Id. at 79–80 (internal citation omitted) (quoting Wagner v. Sec'y of HHS, 906 F.2d 856, 862 (2d Cir. 1990)). The Rosa court concluded that, "by rejecting a treating physician's medical assessment without fully developing the factual record, the ALJ committed legal error." Id. at 80.

Here, as McKane points out, there are no records whatsoever from Dr. Cartwright. In fact, the court is aware of only two references to Dr. Cartwright in the entire 689-page Record: Dr. Cartwright's medical source statement, and an undated medication list, which notes that Dr. Cartwright prescribed Abilify. R. at 351. Clearly, then, the Record does not indicate the duration or nature of the treatment relationship, how frequently McKane met with Dr. Cartwright, whether Dr. Cartwright's opinions were supported by psychological testing, and so on. Dr. Cartwright's treatment notes (as well as any other records pertinent to her treatment relationship with McKane) are therefore relevant to the decision whether to give her opinion controlling weight and, if controlling weight is not given, to the decision of how much weight to give it. See 20 C.F.R. § 416.927.

9

As to whether ALJ Horton should have identified the gap in the record, the court concludes that, regardless of whether McKane's reference to "mental health people" was sufficient to place ALJ Horton on notice that records were missing, the gap should have been obvious for a more simple reason: Dr. Cartwright submitted an opinion as a treating physician. ALJ Horton evaluated Dr. Cartwright's opinion as a treating source opinion. She therefore should have identified the absence of corroborating records as a gap to be filled rather than grounds to reject Dr. Cartwright's opinion.

The court recognizes that remand is not necessary for development of the record in cases where the record as a whole is "adequate to permit an informed finding by the ALJ." Tankisi v. Comm'r of Soc. Sec., 521 Fed. App'x 29, 34 (2d Cir. 2013). In this case, however, the Record is relatively sparse regarding McKane's mental health status since the alleged onset date of January 1, 2012. Of the record evidence, the records which address McKane's mental health in the relevant time period include the following: a consultative examination report by Diana Badillo Martinez, PhD, dated May 1, 2013, R. at 437–40; a consultative examination report by Yacov Kogan, MD, dated June 25, 2013, id. at 521–32; a document entitled "Medical Statement" by Dawn Lawlor, Licensed Clinical Social Worker, id. at 647–48; and treatment records dated July 23, 2013, to August 11, 2013, from The Connection, id. at 554–619, 664–77. Upon review of those records, the court concludes that none of them contain an evaluation of McKane's functional capacity, or can otherwise be said to fill the gap that exists with respect to Dr. Cartwright's records.

The Commissioner argues that Dr. Martinez's opinion, upon which ALJ Horton relied, constitutes substantial evidence to support ALJ Horton's RFC finding. Def.'s

Mot. at 16, see R. at 437–39. There are two problems with this argument. First, Dr. Martinez is a non-treating physician whose evaluation was based on a single examination. While her report is thoughtful and detailed, "a consulting physician's opinions or report should be given limited weight" because "consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990) (quoting Torres v. Bowen, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988)).

Second, Dr. Martinez's opinion is not inconsistent with Dr. Cartwright's opinion. Dr. Martinez summarized her findings as follows:

> Mr. McKane 51-year-old male reports having back pain and spasms due to a work-related injury in 2003. This contributes to moderate pain, spasms and difficulty changing positions or lifting heavy objects. He feels highly limited and unable to work. He also experiences mild anxiety, excessive worry and has engaged in irrational activities. <u>While the physical conditions impress being primary one limiting his ability to work, emotional and interpersonal behaviors and idiosyncrasies may limit his adaptation at work and in social situations.</u>

R. at 438. As this summary reflects, Dr. Martinez did not explicitly make findings as to McKane's functional limitations, but neither did she foreclose the possibility that his mental and emotional condition may impede his capacity to work. In other words, Dr. Martinez's opinion is more circumspect than Dr. Cartwright's, but it does not conflict with it.

For both of these reasons, Dr. Martinez's opinion does not constitute substantial evidence to reject Dr. Cartwright's opinion without seeking additional record evidence. The court concludes, therefore, that the record was not "adequate to permit an informed

11

finding" with respect to Dr. Cartwright's opinion, and remands this case to the ALJ for further development of the record. Tankisi, 521 Fed. App'x at 34. On remand, the ALJ should seek treatment records from Dr. Cartwright. In addition, the court recommends that the ALJ consider contacting Dr. Cartwright for further clarification of her opinion and the basis for her conclusions.

Having concluded that remand is necessary in this case for development of the record, the court need not reach the merits of McKane's additional arguments. However, in the interests of judicial efficiency, the court considers McKane's other claims.

### 2. Opinion of Dr. Mongillo

Dr. Mongillo, who has been treating McKane since at least 2003, completed two medical source statements. The first, completed in March 2013, states that McKane has a preexisting condition of "low back pain" which causes "difficulty bending and lifting." R. at 640. Dr. Mongillo opined that, in an eight hour work day, McKane is limited to sitting for two hours, standing for two hours, and walking for one hour. Id. at 642. Dr. Mongillo further opined that McKane can lift up to ten pounds frequently and up to twenty pounds occasionally, and can carry up to ten pounds occasionally. Id. at 643. Dr. Mongillo indicated that McKane could bend, squat, crawl, climb, and reach occasionally. Id. Dr. Mongillo stated that McKane could never be exposed to unprotected heights, and could occasionally be around moving machinery, exposed to marked changes in temperature and humidity, drive automotive equipment, and be exposed to dust and fumes. Id. at 644. In the section of the form entitled "Please provide objective clinical findings in the following table," Dr. Mongillo listed "back pain"

12

as the only diagnosis and noted "tenderness" and "spasms" as symptoms, but left the "Objective Findings" and "Supportive Test Results" blank. Id. at 642. In the section of the medical source statement form entitled "Mental Status Information," Dr. Mongillo checked "yes" next to the question "Does this patient have mental health or substance abuse issues that impact his or her ability to work?," but left the rest of the section blank. Id. at 644–45. Dr. Mongillo opined that McKane would be unable to work for "twelve months or more," the longest durational option on the form. Id. at 640.

In June 2015, Dr. Mongillo completed another medical source statement. The form he completed was specifically a form for mental evaluation, which McKane attributes to an error by the Hearing Office. Id. at 678–80 (Dr. Mongillo's June 2015 medical source statement); Pl.'s Mem. at 24 ("Unfortunately, the Hearing Office sent Dr. Mongillo the wrong form: Instead of sending him a mental residual functional capacity questionnaire as it did, it should have sent him a physical residual functional capacity questionnaire."). On this form, Dr. Mongillo checked "No" next to the question "Is the ability to understand, remember, and carry out instructions affected by the impairment?," as well as the question "Is ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in the routine work setting, affected by impairment?." R. at 678–79. He also noted that McKane "has difficulty bending and lifting" as a result of "tenderness and spasms in his low back." Id. at 679. Finally, he opined that McKane could manage benefits in his own best interest. Id. at 680.

In her Decision, ALJ Horton concluded that Dr. Mongillo's medical source statements were "conclusory and against the weight of the record as a whole with

13

regard to the physical limitations." Id. at 38. She found that "[t]he medical evidence of record does not support physical limitations as stated, and in fact, most records indicate claimant's physical symptoms are controlled with medication." Id. She further noted that Dr. Mongillo "indicates no mental limitations," which conflicted with her own conclusion that McKane does have mental limitations. Id. She therefore assigned "little evidentiary weight" to Dr. Mongillo's opinions. Id.

McKane asserts that Dr. Mongillo's opinion was sought specifically because his treatment notes were sparse, and argues that it is "circular and absurd" to request an opinion on that basis and then reject it because it is not supported by the treatment notes. Pl.'s Mem. at 24–25. However, the Record also contains correspondence from ALJ Horton to Dr. Mongillo requesting additional information. Specifically, ALJ Horton requested "a new Medical Source Statement, all additional records since November 2014, and a statement supporting your belief with reference to the records why I should find Mr. Mckane disabled." R. at 681. Attached to that letter is a blank medical source statement, which specifically targets physical work-related activities. Id. at 682–87. The letter is dated August 19, 2015, and states that Dr. Mongillo should provide information by September 9, 2015. Id. at 681. The Record does not contain a response from Dr. Mongillo, either in the form of updated treatment records or a new medical source statement. Thus, ALJ Horton attempted to develop the treatment record and opinion evidence before rejecting it. In addition, this argument by McKane oversimplifies ALJ Horton's analysis: as the Commissioner points out, ALJ Horton did not reject Dr. Mongillo's opinion evidence solely on the basis that his treatment notes did not support

14

his opinion, but rather looked to the totality of the record evidence and gaps within the opinions themselves. See id. at 38; Def.'s Mot. at 13–14.

The court concludes that ALJ Horton's analysis with respect to Dr. Mongillo's opinion evidence was supported by substantial evidence. ALJ Horton provided several reasons for rejecting Dr. Mongillo's opinions, all of which are supported by the record. See R. at 38. In addition, ALJ Horton solicited updated treatment notes and further explanation for Dr. Mongillo's opinion, and it was not provided. Therefore, the court concludes that ALJ Horton did not err in her application of the treating physician rule with respect to the opinion evidence submitted by Dr. Mongillo.

In light of the fact that this case is being remanded on other grounds, however, the court suggests that, on remand, the ALJ may want to reach out to Dr. Mongillo once again to solicit a new—physical—medical source statement, updated treatment notes, and additional explanation for Dr. Mongillo's conclusions.

### B. Credibility Evaluation of McKane's Testimony

In his Memorandum, McKane asserts that ALJ Horton erred in her evaluation of his testimony regarding his pain. Pl.'s Mem. at 28–30. At the hearing, McKane testified that he experiences "constant" pain in his back, which is alleviated in part by medication. R. at 100. He testified that he had difficulty showering and performing household chores because "every couple of months" his back goes out and he cannot function. Id. at 101. McKane further stated that he could sit for about fifteen minutes at a time and stand for about fifteen minutes of the time and can barely lift anything. Id. at 101–02.

In her Decision, ALJ Horton detailed McKane's treatment history with respect to his back pain, noting that treatment records generally reflect that McKane has suffered

15

from back pain since 2003, but it is has been controlled by medication. Id. at 36–37. She acknowledged McKane's testimony with respect to his functional limitations but concluded that McKane's medical records and activities of daily living undermined McKane's testimony as to the extent of his functional limitations. Her RFC determination, however, takes McKane's back pain into consideration to some degree, finding that McKane is capable of no more than light work, with "occasional bending, squatting, crawling, and climbing." Id. at 36. Given McKane's testimony, the medical record, and the fact that ALJ Horton did factor pain into her RFC determination, the court finds nothing erroneous in ALJ Horton's evaluation of McKane's testimony with respect to his pain.

Of course, further development of the record on remand may compel the ALJ to revisit this conclusion. On the current record, however, the court concludes that ALJ Horton's credibility determination was supported by substantial evidence.

C.      Availability of Jobs

McKane's final challenge to ALJ Horton's decision relates to her conclusion that significant numbers of jobs existed in the national economy that McKane could perform. During ALJ Horton's examination of vocational expert Richard B. Gordon ("Gordon"), Gordon gave the following answer to ALJ Horton's question whether jobs existed in the national economy that someone with McKane's RFC could perform:

> Yes, ma'am. An example is gate guard. The [Dictionary of Occupational Titles ("DOT")] is 372.667-010. It is light, [specific vocational preparation ("SVP")] 2. National number 120,000. . . . Another example is router, DOT 222.567-038. It is light demand, SVP 2. National number 110,000. . . . A third example is order caller, DOT 209.267-014. It is light demand, SVP 2. National number 120,000. . . . Once again, these are only examples.

16

R. at 117.

McKane asserts that two of the three positions identified by Gordon—Router and Order Caller—do not appear in the Dictionary of Occupational Titles under the listings he cited, and it is therefore impossible to verify the accuracy of his testimony. Pl.'s Mem. at 33–34. The Commissioner asserts that these positions are listed in the DOT, albeit at listings that differ as to a single digit in each case, and attributes the listing inaccuracies to "a typographical error" in the "administrative transcript." Def.'s Mot. at 19. The Commissioner argues that McKane's "statement that these jobs simply do not exist is false and without merit." Id.

As a preliminary matter, the court takes issue with the Commissioner's apparent assumption that the court reporter who transcribed—and swore to the accuracy of—the hearing is less reliable than the vocational expert who testified. See R. at 120. However, the Commissioner's argument that both Router and Order Caller are listed positions in the DOT is better taken. Particularly given that McKane cites to the online version of the DOT in his Memorandum, the court considers McKane's statement that the error with respect to the listing made it "impossible to know what in the world [Gordon] was talking about" hyperbolic. Pl.'s Mem. at 33–34.

McKane further asserts that, according to the Bureau of Labor Statistics, the other position that Gordon identified, Gate Guard, exists in the national economy in less than half the volume cited by Gordon, 43,220 jobs as opposed to the 120,000 jobs to which Gordon testified. Id. at 34. The Commissioner does not dispute the accuracy of McKane's numerical assertions, but asserts that so long as "job numbers stated by the [vocational expert] 'did not introduce any meaningful uncertainty as to the number' of

17

positions available in the local or national economy, the ALJ properly may rely on the [vocational expert]'s testimony." Def.'s Mot. at 19 (quoting Kennedy v. Astrue, 343 Fed. App'x 719, 722 (2d Cir. 2009)).

The court makes no conclusion as to whether this issue would warrant remand on its own. However, in light of the fact that this case is already being remanded for development of the medical record, the court further orders the ALJ to elicit a basis for the vocational expert's conclusions as to the availability of jobs, so long as the ALJ's findings on remand do not obviate the need for vocational evidence. In so ordering, the court is mindful of the Second Circuit's holding that vocational experts are "not required to identify with specificity the figures or sources supporting [their] conclusion[s], at least where [they] identif[y] the sources generally." McIntyre v. Colvin, 758 F.3d 146, 152 (2d Cir. 2014). Nevertheless, the Second Circuit has also held that "evidence cannot be substantial if it is 'conjured out of whole cloth.'" Brault v. Comm'r of Soc. Sec., 683 F.3d 443, 450 (2d Cir. 2012) (quoting Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002)). Here, Gordon did not identify the source of his testimony, and the most likely source, namely the Bureau of Labor Statistics, apparently did not align with at least one of the numbers that Gordon quoted. Thus, while the Second Circuit has not established a high bar for vocational expert testimony, the court concludes that the testimony in this case does not meet that bar.

## V. CONCLUSION

For the foregoing reasons, McKane's Motion to Reverse the Decision of the Commissioner (Doc. No. 25) is hereby **GRANTED** and the Commissioner's Motion to Affirm the Decision of the Commissioner (Doc. No. 31) is hereby **DENIED**. The case is remanded to the Social Security Administration for further proceedings consistent with

this Ruling.  The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the District Judge who issued the Ruling that remanded the case.

**SO ORDERED.**

Dated this 7th day of March 2018 at New Haven, Connecticut.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge